Our final case this morning is Crittenden v. City of Tahlequah. The number is 18-7036. Counsel, you may proceed. My name is Dan Smolen. I represent the estate of Joshua Crittenden. On June 27, 2015, Joshua Crittenden was gunned down and shot by the Tahlequah Police Department. He was gunned down in a side yard of his friend's parents' home. It was broad daylight at the time that he was gunned down in that yard. At the time of the shooting, Mr. Crittenden did not have a weapon in his hand. He was not fleeing. He was not coming at the officers. You're reciting the testimony of the affidavit of the fellow sitting in the car. That's correct, Your Honor, as well as other evidence that I believe existed in the record that would substantiate those statements. What is the independent evidence in the record that supports what the affiant said? I forgot his name. I'm sorry. Benjamin Brown. Benjamin Brown. The physical evidence in the record that would substantiate that? Yes. You would have the fact that Officer Bell, when immediately following the shooting, was there to search the perimeter of where the shooting happened. She did not find a weapon. But aren't there photographs that indicate that there's a weapon up in the upper right or something? There's a video that the defendant's claim shows a weapon in the video, which we dispute. I have to tell you, I didn't look at the video. Does the video clearly indicate that that is not a weapon? It doesn't – no. It could be soil. It could be a shadow. It could be anything. It's something dark or something. Anything dark. I mean anything that's a darker green than the grass. It doesn't show that it's a weapon. Correct. And didn't they create a still shot of what they thought was a weapon? I think they did create a still shot of what they thought was a weapon. And you don't think that was a weapon? No, I don't think that it was a weapon. Is the still shot unclear enough? I believe that the still shot is unclear enough. And I also believe that even if there was a weapon on his person at the time, that the officer had no right to shoot and kill Joshua Crittenden. Are you talking about a weapon at the time he hit the ground or at the time he popped up? At the time that he hit the ground or the time that he popped up. I don't think – based on Benjamin Brown's statement, the fact that there was an empty holster. Are you saying that even if the record indicates that he had a weapon when he popped up? Oh, no, no, no. I misunderstood your question. No, I don't believe that – I don't believe that the record indicates that at all. We have Officer Tanner's statement that Mr. Crittenden possessed a gun in his hand and that he was charging at him at the time that the shots were fired. That is directly contradicted by the statements of the only other living eyewitness to the event, Benjamin Brown. Well, but didn't some of the other officers call out that Mr. Crittenden had a gun? In the video, if you review the video, you'll hear Officer Bell screaming, drop the gun, drop the gun, drop the gun. But in deposition when I asked her, did you actually see Mr. Crittenden with a gun, she said no. We also have Officer Feld's statement that Mr. Crittenden was pointing a gun while he was up in the attic. And then we actually do have video where we can see Mr. Crittenden in the attic from the outside of the home through the body cam, but you don't see a weapon in Mr. Crittenden's hand. Is that video containing the entirety of the time that he was out the window? The video, the part that you can see, Your Honor, is when Mr. Crittenden is in the attic. You can see him up there from the outside and you don't see a weapon. And in their statements, they said the video runs the entire time that he's up there. There is video running the entire time he's up there. We have different vantage points because we have different officers who are in different locations on the premises. But what we don't see in the video that was stated in the record was that Joshua Crittenden was scanning back and forth with a pistol, which is what the officer said. But we do see Mr. Crittenden in the attic, and at no point in time is he ever scanning with a weapon held. We know that Mr. Brown swore under oath that Joshua had left his weapon in his truck because at the times that he'd been to his parents' house before, Joshua knew that his parents wouldn't allow a weapon in the home. We know that Benjamin Brown, when he was questioned by OSBI immediately following the incident, stated that Joshua Crittenden never had a weapon in his hand. At no point in time did he ever point a weapon at the officer. We also have testimony from Mr. Brown that prior to descending from the attic, that Mr. Crittenden repeatedly stated, I'm coming down, I'm coming down, don't shoot, I'm coming down. 20 seconds later, we hear gunshots fired, and Joshua Crittenden's... Why is that? How should that cut? If he says, I'm coming down, don't shoot, does that really tell us he doesn't have a gun? I think it's evidence of surrender, and I don't think it's about whether he has a gun on his person or not, it's whether or not there was imminent risk to the officer. In this case, what we have is we've got contradicting testimony. We've got Tanner saying, he was charging at me with a weapon pointed at me. We've got another witness saying, he never had a gun pointed at the officer, and he never had a gun in his hand. Could he have had a weapon? I don't think that under these circumstances that he could, but even if you took that, even if you said, okay, he could have had a weapon on his person... Well, Mr. Brown, though, was sitting in a car out on the curb of the street, correct? Correct, and I think what's so critical about that is when OSBI questions Officer Tanner immediately following the incident, they ask him, could Benjamin Brown have seen the shooting from where he was sitting in the patrol vehicle? Tanner says, yes, he could have seen it from where he was sitting. You don't see anything about obstruction of a viewpoint coming in until Jim Clark, who they've endorsed as an expert, comes in with an affidavit in the reply brief talking about certain obstructions that existed. But even Jim Clark, their expert in his deposition, said that Brown could have been a witness to the shooting and would have been the only other witness who was alive other than Officer Tanner. So if we take the statements made right after the investigation starts, we've got Tanner saying that Mr. Brown was in a position to see the shooting. We've got Jim Clark, their expert in a deposition, saying Brown would have been in a position to see the shooting. And the court chooses to discredit the testimony of Brown because they say, well, he said something different to OSBI. But that again isn't the case. Brown never says anything inconsistent to OSBI that he says in his affidavit that was submitted in this case. What he told OSBI was, Mr. Credit did not have a weapon. He did not point a weapon at the officer. He did not have a weapon in his hand. He was pressed in that questioning, could he have had a gun on his person? And Mr. Credit says, well, I don't know. I mean, I can't say 100% he couldn't have had a gun on his person. And so there's no inconsistency in those statements. The issue was, did Joshua Credit have a gun in his hand and point that gun at the time he was shot by Officer Tanner? The evidence viewed in the light most favorable to the plaintiff is he did not. The evidence in view light most favorable to the plaintiff is he was surrendering. He was coming down out of the attic. He told them, don't shoot. Benjamin Brown says he didn't have a weapon when he came out of the attic and he clearly saw the shooting, which was corroborated by the fact that both Clark and Tanner acknowledged that Brown would have been in a position to witness it. It's not a situation where we have an eyewitness who is in some remote location saying he saw something that clearly he couldn't have seen. Let's go to the clearly established law. What's your best case of substantially similar factual situation, which establishes clearly established law? I think that there's several cases. I think the Tennessee v. Gardner case with respect to the use of deadly force. Tennessee v. Gardner. I don't want generality of deadly force. I want specificity of fact substantially similar. I think under the Pauley v. White, the new Supreme Court case from 2017, are there a set of cases out there that would have put an officer on notice that shooting an unarmed suspect who was not presenting any kind of imminent risk could lead to a constitutional violation. I think that there's a number of cases out there in those line of facts, such as Tennessee v. Gardner, which is at page 22 of the brief. The Zia Trust case, which is at page 23 of our brief. But there are a number of cases that if you view the light and if you view the evidence in a light most favorable to Mr. Crittenden, that clearly establishes that these are all excessive force cases. Those are excessive force cases. And then you have the estate of Booker, which was excessive force case and also involved the denial of medical treatment following a use of deadly force. And so I think those cases, especially the Booker case, as far as whether or not it was clearly established right, if you view the evidence in this case in a light most favorable to the plaintiff, and then you take those cases, clearly there's enough notice to put the officer. But the Booker case is more geared to your deliberate indifference claim, isn't it? Yes, it is. All right. Let's talk about that for a second. You assert in your brief that the need to secure the house and secure the scene after Mr. Crittenden was shot was, quote-unquote, patently absurd. But why wasn't there a legitimate concern that there might be somebody in the house, who could be hiding there somewhere, who could do harm to officers or onlookers or the EMS workers while they attended Mr. Crittenden? Your Honor, I believe that it was Officer Bell in her deposition, and I believe I'm correct on this, who said it was ridiculous that they didn't allow EMTs to access Mr. Crittenden. That wasn't my question. My question is whether there was a legitimate concern to secure the scene. Your Honor, the scene where the shooting took place, where Mr. Crittenden was laying on the ground, was outside of the home. They said that there was a 12-minute delay, not securing the scene, but bringing in a pull cam that they wanted to use to put up in the attic. All right. Let me rephrase. I'm trying to get to the fact that they went into the house to see if anybody else was there who could do harm to somebody. What's wrong with that? Nothing's wrong with that. Then why are you saying it's patently absurd? Because what they did was they prevented EMTs from accessing Mr. Crittenden, who was outside on the side yard. But I'm concerned that the EMTs could put themselves in harm's way if there's somebody still in the house. Because where Mr. Crittenden was, was not in the house. I know. But somebody could come out of the house, shoot from a window. They had to figure out if this incident had concluded. What is wrong with that? Isn't that standard protocol? I think it's standard protocol to check a premises. I don't think it's standard protocol to prevent EMT access to the suspect who you just shot and to allow a 12-minute delay. My question went to whether or not when Marshall Buell came on the scene and said, we've got to check this out. I just don't see where that's patently absurd. Why wouldn't you check the house? In fact, if they hadn't checked the house and something had happened, wouldn't they be faulted for not checking the house? She didn't say that. You said that in your brief. She said it's ridiculous. She said it's ridiculous. She said it was patently absurd. Well, whatever. I just don't understand why it was unreasonable for the officers to check the house. It wasn't unreasonable for the officers to check the house. What was unreasonable, if you watched the video. You said the need to clear the house and secure the scene was patently absurd. As a denial for access to medical. I'm not saying that the need to check the house was absurd, but the need to check the house and prevent medical. Let me just ask you on clearly established law on this. How is this case substantially similar to the state of Booker, which occurred in a detention facility where there was no ongoing concern about whether there were any other shooters or others around. And when the plaintiff suffered medical problems there. It's a different environment than what we're talking about here. I would agree that it's a different environment and what we're talking about as far as a correctional setting, a jail setting versus out in the field. But I think when you watch the video from the shooting after the incident, it's clear by the way that the officers are responding after the shooting. They're milling around the yard. No one is locking down the perimeter. There's nothing going on that would indicate in the video when you watch it that there was any sense of fear that these officers had that they were going to be harmed if they allowed EMTs to access Mr. Crittenden and provide emergency aid. And I think that it is clearly established that the denial of preventing a suspect or an inmate in a jail setting from receiving emergency medical treatment. If it worsens the pain or delays the treatment, even if it's a minor delay, is enough under the CLOC case. Under the clearly established law on the shooting versus the rendering medical care. You said that these cases indicate clearly established law that under the circumstances we have here, it was unlawful for him to . . . it was unreasonable for him to shoot the unarmed victim. But we're not talking about whether he's armed or unarmed. We're talking about whether or not there's clearly established law at the time that would give sufficient notice to the police officer. Isn't that correct? Isn't that the way we look at clearly established law? With a reasonable officer. So you can set aside as . . . it doesn't matter whether he's armed or unarmed. It's what a reasonable police officer would be thinking at the time. And is he supposed to be thinking, oh my gosh, this could be a constitutional violation if my perception is wrong? What's interesting about this case is it's not a case where someone says, well, he kind of pointed a gun or he kind of didn't point a gun or he raised his arm in a motion that looked like he was pointing a gun and he didn't actually have a gun. This is a situation where you have two contradicting testimonies. You've got one guy saying, look, he never at once showed anything that would have led an officer to believe that there was an imminent threat. If you were to believe Benjamin Brown's testimony that he had no weapon, he never raised his arm, he never tried to flee, and he never came at the officer, there is no imminent threat. And for an officer to use lethal force in a situation where there is no imminent threat of danger to himself or to others is clearly established. Okay, but here's the circumstance. You have this guy up in this attic window and people around him are saying, gun, gun, gun. And the kid takes a dive and he hits the ground. He then pops up and in the time that it takes, from when he popped up to the time he shot, the officer has to make a judgment that he's armed or unarmed. And if he makes a wrong judgment, he's committed a constitutional violation and the law under these cases you cite is clearly established? I believe that it is. I'm not sure about that. Well, and I think that what we're asking law enforcement to do on a day-to-day basis are make split-second decisions to have proper training to evaluate situations. All the time, these are rapidly evolving situations. And so I think that when you look at the precedent that the case law has established, you have to look at it from the standpoint, are there cases out there or a line of cases out there that say, if you use lawful force on a suspect who doesn't possess any kind of imminent threat to the officer or to others around them, then it's clearly established that for you to shoot them would violate their constitutional rights. In this case, if we accept the testimony of Benjamin Brown as well as some of the other evidence, I think it's – if you accept that as true at this stage of the game, it can certainly be challenged, obviously, at trial. But if you accept that as true, there was no imminent threat to Officer Tanner with an unarmed – So you're familiar with the city of Escondido, obviously, with the Supreme Court case of 2019? I'm not going to say that I'm – That's the case where they said, when we're talking about excessive force cases, you have to be very, very – you have to have a case with very, very specific facts that correspond to the case at Barr. And in that case, the fellow was not really a threat. He was taken down, Mr. Eamons, and they reversed the Ninth Circuit and sent it back and said that, no, there was no clearly established law. Again, your Honor, I would just rely on the cases that we cite that we feel like an unarmed, non-flea, non-confrontational suspect who poses – what threat did he pose if he was unarmed and he's there and he's got no weapon? OK. Let me ask you this. In the general law that we have in the Tenth Circuit, do you agree that excessive force cases are different and that they require more specificity of corresponding facts with the cases that you're relying upon for clearly established law? Do you agree with that? I don't know if I would know enough about it to tell you honestly whether I agree or disagree. But as a matter of law, I don't – Do excessive case – excessive force cases require more specificity of correspondence of facts to establish clearly established law? I think that there's so much debate with clearly established right now between the circuits and the Supreme Court as far as what does that mean. And as many cases that I've dealt with, the way that I've seen it used, it's hard to understand whether or not that's a specific requirement specifically for an excessive force case or not. We see it all the time come up in the medical context. We see it come up in excessive force cases. And to sit there and for me to tell you do I agree or disagree with that, I can't. Because there's so much happening in the circuit courts on clearly established right right now that it's hard for me to give you a definitive answer. And that's the only way I could answer your question. And so I think we're over time. Okay. Thank you. I appreciate the extra time. Good afternoon. My name is Scott Wood. I'm the attorney for the city of Tahlequah and its officers, Tanner McNeil and Phelps, as well as Shannon Buell, who was a Cherokee Nation marshal, who was on the scene that day. May it please the court. To really understand how this the allegation of being shot unarmed came up, you have to understand the timeline that you can get out of the record. Of course, Mr. Smolin told you that the shooting occurred in June. I think it's June 27th of 2015. The lawsuit was filed on March 27th of 17. And the complaint alleges excessive force, but never makes a factual allegation that Mr. Crittenden was unarmed at the time he was shot. In fact, paragraph 64 of the complaint says, at the time Tanner began to use force against Crittenden, some force may have been justified. However, firing six shots, at least three of which struck Crittenden, clearly constitutes unnecessary and excessive use of force. So we go all the way through discovery, and nothing is ever filed or produced that would indicate that their theory of the case is that Mr. Crittenden was unarmed at the time that he was shot. We file our motion for summary judgment, and then when a response comes, we find this affidavit from Benjamin Brown. And if you look in the very first contact that we can see with Mr. Brown after the shooting, is when an Oklahoma State Highway Patrol trooper goes to the car to move him and transport him to jail. I think he had warrants out for his arrest. The door is opened, and Mr. Brown says, is he okay? And the trooper answers, probably not. That's what you get when you pull a gun on the police. So from that standpoint, Mr. Brown doesn't make any response to that, doesn't say, by God, he didn't have anything in his hand. He didn't pull a gun on the police. Instead, he's carted off to jail, where he's later interviewed by Vicki Lyons, the OSBI agent. We can sort through the sham theory, because we see that a lot, but we normally see it in a deposition setting, and that is where a deponent changes his or her testimony. And we can sort through that. What I would like you to tell me is why there's not a genuine issue of material fact, if we don't buy your sham argument and we have to look at the Brown affidavit on his face. Doesn't that indicate that there's a genuine issue of fact about whether he was armed? Well, there is some physical evidence that I just don't think can be controverted by any one statement. And that would be the testimony about him having a gun at the time and all the things that indicate that he had a gun. But we have somebody who has an affidavit that I'm telling you for purposes of the question you have to accept, who says he didn't. How do you get around that? Well, there's a picture of the gun taken by the crime scene. Is this the still life we were talking about? There's an extract that's from the body camera. And then there's a crime scene photograph taken later. So was there just a gun laying in the yard and he happened to get shot and fall next to it? Do they show that this thing depicted, both in the video and the still life, is clearly a gun and not something else? Absolutely. One of the things you can see in both photographs, and the crime scene photograph is obviously better than the one extracted out of the video, is a little red-orange dot that indicates that the safety is off, it's on the side of the gun. You can see those in both photographs. Okay, and you're telling me then that unequivocally established that at least the time when the victim, Josh, hits the ground, at least at that point, he had a gun. You're saying unequivocally establishes that and debunks the Brown memo at that point? I do, and there's another piece of physical evidence that does that as well. In the ME's report, there is a diagram that she drew about the wound he had on his right hand. And it's found at 1065 in the record. And I got the small copy right here. And it shows the right hand extended out in front and shows that the, you can read the description in the ME's report, that there's a grazed gunshot wound that goes up the back of the hand that's distal to proximate right here on the front knuckle. There is only one way that can happen in this scenario. His hand had to be extended like this when he was shot. Okay, so that's after he's laying prone and it's when he pops up. Tanner says he pops up with the gun pointed directly at him and he begins firing. And that unequivocally negates the Brown testimony. I believe it does. If you think about it, that hand wound can only happen one way. Someone, they were directly facing each other. The hand was extended like this. If it was like this, the gunshot would go through the knuckles. I guess if you had his hands up in the air and Tanner shot straight up and it came down, it may be. But the most rational, reasonable explanation is that his hand was extended in front of him. He went to the extension of the hand, not whether there was anything in the hand or what it was in his hand, right? And I do agree with that. And Judge White addressed that in his order and basically said Tanner would be involved, entitled to qualified immunity, even if under this scenario we got a guy surrounded in a house. We've seen him. Two officers have seen him with a gun. They've announced it on the radio. They've called for SWAT. Okay? And he jumps out and pops up and points his hand like that. On the video and the still life, was there ever any questioning of if that's a gun, if it belongs to somebody other than Josh? I don't believe so. I think from the very beginning because, you know, when you initially see him in the picture, the first thing you see is when they roll him over is he has a gun holster on, on his right side. So from that standpoint, and let me just address the level of threat that existed. They arrived. They discover a stolen vehicle. That vehicle is full of guns and ammunition. And then they have this guy who's in the attic, and two officers see him holding a gun in his hand. And he won't come down. And he won't give up. And so the level of threat is extremely high under this scenario. So from that standpoint, I think Tanner would be entitled to qualified immunity whether or not Crittenden had a gun or not under these circumstances. I believe Crittenden did have a gun. There's no other way to explain the presence of the gun just above his head within seconds. I want to make sure I understand your last comment. If there was no gun, why would Officer Tanner be justified in shooting? Because it had been reported to him he has a gun. And in a situation that's tense, certain, rapidly evolving, he had to make a split-second decision about what he could do to defend himself. He may have just seen the arm coming out straight like that. We have other cases where people have cell phones or don't have a gun, and they get shot because they make a sudden furtive movement in a circumstance where the officers already have assessed that the situation is a high level of threat. One other thing. Counsel, can I just ask you, who was in charge of the crime scene after Mr. Crittenden was shot? Was it the Marshal Service or was it the Tahlequah Police Department? Yeah, that was a joint effort, and the Marshal Service and the Tahlequah Police Department have a mutual aid agreement. And so after Officer Feltz had called for the SWAT team, this group of Cherokee Marshals was at a nearby restaurant and came to the scene. Shannon Buell is the head of the Cherokee Marshals SWAT team. So I will say that once he arrived, he kind of took control of managing the scene and what was going on. And, you know, in fairness, Officer Bell, who was a fairly new officer, she did make that statement, this is ridiculous, if you listen to that tape, Officer Feltz says they're SWAT and we're not. So that they were going to let them handle the tactical aspect of clearing not just the house, but the attic. The attic is what was really a concern to them. And Deputy Marshal Buell, he was the one, wasn't he, who instructed that EMS not be allowed to treat Mr. Crittenden until the house was cleared? That is correct. All right. Now I want to ask you, I've watched the video and Mr. Smolin talked about the video. And it does appear that the officers are kind of standing around the yard area. And there's Mr. Crittenden lying on the ground. And there doesn't seem to be a real sense of urgency among those officers insofar as securing the house or the scene or whatever. I mean, there's people in the house, but there they are. And what I'm having a hard time understanding is why would they be at any more risk if they were to attend to Mr. Crittenden as opposed to just standing around? I mean, if they're at risk, they're at risk either way. Yeah. And I'd made that same observation myself from having represented officers for years. I mean, if you look at that videotape, Bronson McNeil is absolutely unwound over what's happened. And so I will say, tactically, they did make some, could have been, grave errors by turning their back towards that hole in the opening of the attic right there. There should have been a real concern from the very start that a potential threat lurking. Well, was there any evidence that they followed protocol in not attending to Mr. Crittenden or not allowing them to intervene? Yeah, there was testimony about that. Every officer that was asked said they had no medical training on what to do for a penetrating gunshot wound of the head. Let me put it this way. What if an officer had been hit on the ground? Would they have attended to the officer? Well, I think that's a different situation. The handcuff's another person who needs medical attention and we've still got to secure the house. Does it make a difference that it's the alleged perpetrator here? I mean, if you've got an injured person on the ground who's in need of medical help and that help can be provided and it's not... Yeah, they fulfilled their duty. You can hear Reed Feltz get on the radio and call for EMS as soon as they get around to that side of the house. Officer McNeil handcuffs the suspect. They've called EMS. That fulfills their duty under Wilson v. Minx. But EMS was kept away from him as well. Correct. Well, they know what... Because Wilson... They're trained to do something. Wilson v. Minx says also the first responsibility of the police is to make sure that they are safe and the public is safe. Well, I understand that, but the video shows them pretty much just standing around the body. Right. And if you watch the second video, when EMT gets there, they pretty much stand around the body. This was a fatal head wound which no amount of treatment could have changed. But that's a causation issue. That's a causation issue. It didn't have anything to do with... And it's a pain and suffering claim, isn't it? It's not that he ultimately died. It was that he was allowed to suffer during that period of time. Yeah, I don't know what you did to relieve suffering from a penetrating gunshot wound to the head. Well, you did nothing. That's what happened. I wouldn't know what to do. Well, the EMS was supposed to know what to do. Well, they hauled him to the hospital where they pronounced him dead. Yeah, but they were kept away from him. Right, which didn't change anything. It might have changed the length of time he was suffering. Yeah. Well, there's no established case law that says a police officer has that duty. What about a state of Booker? Booker, he's not a pretrial detainee as yet. I mean, he's not even... You made this distinction earlier when you asked him about qualified immunity. Distinction makes a difference. Booker is a totally different case. Thank you. Counsel, we appreciate your argument. Thanks to both of you for your arguments this morning and part of this afternoon. The case will be submitted. Counsel are excused. Travel safely.